## Case No. 13,500.

### STOUGHTON v. DIMICK.

[3 Blatchf. 356;[1] 18 Law Rep. 557; 29 Vt. 535.]

Circuit Court, D. Vermont. Oct. Term, 1855.

NEUTRALITY — SEIZURE BY MILITARY OFFICER— PERSONAL LIABILITY—LIMITATION OF ACTIONS.

1. Where an officer belonging to a military force ordered out by the president, under the 8th section of the neutrality act of March 10, 1838 (5 Stat. 214), "to prevent the violation and to enforce the due execution" of the act, and instructed by his commanding general to execute that purpose, seized property, as a precautionary means to prevent an intended violation of the act, with a view of detaining it until an officer having the power to seize and hold it, for the purpose of proceeding with it in the manner directed by the statute, could be procured and act in the matter: *Held*, that the seizure was lawful.

2. Where the property so seized by such officer was a vessel, which was not intended to pass the frontier herself, but was laden with arms and munitions of war, which were intended to be transported across the frontier, for the use of insurgents in Canada, then in arms, near the line, against Great Britain, and the vessel was wrecked the same night, without any fault on the part of the officer: *Held*, that an action of trover for the vessel could not be sustained against him.

3. Circumstances stated under which a plaintiff is chargeable with knowledge of the existence of attachable property of a defendant in the state of Vermont, so as to cause the statute of limitations of that state to run in favor of the defendant, even though he be personally absent from the state.

This was an action of trover [by De Clancy Stoughton against Justin Dimick] to recover the value of a vessel taken and detained by the defendant while acting in the capacity of a military officer, under the act of congress of March 10, 1838 (5 Stat. 212), commonly called the "Neutrality Act." The defendant pleaded not guilty, and the statute of limitations. A verdict was rendered for the plaintiff, with damages assessed, upon the issue joined on the former plea, and for the defendant on the issue growing out of the latter plea. The verdict was taken subject to the opinion of the court on the law arising upon the facts proved, and was to stand, or be altered or amended, and judgment to be rendered thereon, or to be set aside and a new trial to be granted, accordingly as that opinion might be.

---

[1] [Reported by Hon. Samuel Blatchford, Circuit Judge, and here reprinted by permission.]

[1] [Reported by Samuel Blatchford, Esq., and here reprinted by permission.]

O. Stevens, for plaintiff.

Lucius B. Peck, Dist. Atty., for defendant.

PRENTISS, District Judge. Two questions arise in this case: (1) Whether the defendant had authority to take and detain the vessel; (2) whether the action is barred by the statute of limitations.

1. Admitting that no officer but one of those mentioned in the first section of the act of 1838, a collector, naval officer, surveyor, inspector of the customs, marshal, deputy-marshal, or other officer specially empowered by the president for the purpose,—could make a seizure, properly speaking, under the act, or, in other words, could take property for the purpose of holding and proceeding with it in the manner prescribed by the act, the question still remains, whether the defendant, by taking the vessel in question into his possession, under the circumstances, and in the manner and for the purpose he did, assumed unauthorized power, and is, consequently, liable to the plaintiff for it.

By the 8th section of the act, it was made lawful for the president, or such person as he might empower for the purpose, to employ such part of the land or naval forces of the United States, or of the militia, as should be necessary "to prevent the violation, and to enforce the due execution," of the act. Under instructions from the president, and pursuant to the power thus given to him, a military force, by orders issued by the secretary of war, was placed at different points upon the Northern frontier—at Niagara, at Sackett's Harbor, and at Plattsburgh, on Lake Champlain. The defendant was a captain in the army, stationed at the latter place, and was ordered, by the commanding general of the station, to take post, with his company, at Rouse's Point, on the lake, near the frontier line, for the purposes mentioned in the section just referred to, with instructions faithfully to execute those purposes. Under the orders thus given to him, and while stationed at the post so assigned to him, the defendant, at Champlain, a port a short distance this side of the line, took possession of the vessel. The vessel was fastened to the dock, but was wrecked and destroyed, in the night of the same day, by a storm, so that it could no longer be the subject of detention, of re-delivery, or of any proceeding under the act.

Though the destination of the vessel was only to Champlain, and she was not intended to pass the line, she had arms and munitions of war on board, which were intended to be taken across the line, though by another conveyance, to and for the use of the insurgents in Canada, then in arms near the line. If the vessel herself, as the plaintiff would maintain, was not liable to seizure, not being, in fact, "about to pass the frontier," clearly, the arms and munitions of war on board of her, among which were eight tons of fixed ammunition, were so liable; and these could not be seized and secured without, or otherwise than by, arresting and taking possession of the vessel. And, even supposing that the military force, so far as concerned the seizure of property, was intended to act in aid of the civil authority, or rather of the civil officers mentioned in the first section of the act, and that the commander of such force had not the power of seizure which those officers had, he might, at least, when necessary, take property, as a precautionary measure to prevent an intended violation of the act, and detain the property, until an officer having the power to seize and hold it for the purpose of proceeding with it in the manner directed, might be procured and act in the matter. Without such power, how could the military force fully perform the duty assigned to it, or be effectually employed "to prevent the violation, and to enforce the due execution," of the act? In this view, which is, perhaps, a view more limited and restricted than might be consistently taken, the defendant did not exceed the authority given him by the act; and, as it does not appear that the loss of the vessel was the consequence of any want of ordinary care on his part, he cannot be held liable for it.

2. The plaintiff having, as appears from what has been said, no cause of action against the defendant, the question arising under the statute of limitations ceases to be of any importance in the case. Still, as that question has claimed and received consideration, it may be well to say a few words upon it, rather than pass it over in entire silence.

The statute of limitations of this state runs in favor of a party, although he be absent from and resides out of the state, if he have, to use the words of the statute, "known property within the state, which could, by the common and ordinary process of law, be attached." [Rev. St. 1839, c. 58, p. 307.] The meaning and intention are, that the statute shall not run in favor of a party who is not subject to process; but that, if he be subject to process, either by being personally within the state, or having known attachable property within it, the statute runs in his favor.

It was settled by the supreme court of this state, in the case of Wheeler v. Brewer, 20 Vt. 113, that actual knowledge of the property and of the defendant's title to it, need not be possessed by the plaintiff, if, by reasonable diligence, he would acquire that knowledge; but that, in order to warrant this inference, and thereby to bar the action, the defendant's ownership of the property must be notorious, to such an extent that it would not escape a reasonable search and inquiry on the part of the plaintiff. Taking this to be the law of the state, the inquiry here is, whether the defendant had such property, and whether the plaintiff, by rea-

sonable diligence, might have obtained knowledge of it.

It appears that the defendant owned a large and valuable farm, with stock upon it, in Bennington, in this state, situate about two miles west of the village, on the great road to Albany, called and known as the "Dimick Farm," and formerly occupied for many years by the defendant's father as a tavern stand. The farm consisted of two hundred acres, was of the value of six thousand dollars, and was conveyed to the defendant ·by his father, subject to a life estate in the father, by a deed duly executed and recorded in 1830. The father died in 1839, and the defendant has ever since leased the farm, with the stock upon it, to tenants, who have occupied it under him. Both farm and stock, during the whole time. have been set in the list, for the purpose of taxation, in the name of the defendant, with the name of the occupant, ·and were generally known in the town, which, it is to be observed, was not only the seat of justice for the county, but a town otherwise of much note, to be the property of the defendant.

In addition to these facts, it is to be borne in mind, that Bennington, where the property was situate, was the dwelling-place of the family, while living, to which the defendant belonged, and the place where he was brought up, and where he might, if anywhere, claim to have his domicile. though personally absent therefrom, except an occasional return, during his long service in the army; and, taking all the facts together, it appears to us, that they well warrant the conclusion, that the plaintiff might, in the course of the six years allowed him .for inquiry, by using reasonable diligence and due means, have ascertained and‸ attached the property.

Such being our opinion upon the several questions involved in the case, the defendant ·is, of course. entitled to judgment, and judgment must be entered up for him on the verdict accordingly.